# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# NORTHERN DIVISION
# AT COVINGTON

CRIMINAL ACTION NO. 18-53-DLB-CJS-1

UNITED STATES OF AMERICA                                          PLAINTIFF

v.                **MEMORANDUM OPINION AND ORDER**

QUINN R. TURNER                                                  DEFENDANT

\*\*\* \*\*\* \*\*\* \*\*\*

## I.    INTRODUCTION

This matter is before the Court on Defendant's Motion to Suppress all evidence seized from the automobile he was driving on October 3, 2018. (Doc. # 29). In his Motion, Mr. Turner argues that law enforcement officers lacked probable cause to arrest him and that all evidence seized thereafter should be suppressed.

On April 11, 2019, the Court held an evidentiary hearing on the Motion. (Doc. # 41). Defendant Turner was present at the hearing and represented by attorney Michael Goodwin. The United States was represented by Assistant United States Attorney Anthony Bracke. The hearing was recorded by the Official Court Reporter Lisa Wiesman. Prior to the hearing, the Defendant filed a Memorandum in Support of his Motion to Suppress (Doc. # 29-1) and the United States filed a Response in Opposition (Doc. # 36). At the Court's direction, the parties filed supplemental briefing after the conclusion of the evidentiary hearing. (Docs. # 44 and 45). The Motion is now ripe for the Court's review. For the reasons set forth herein, Defendant's Motion to Suppress (Doc. # 29) is **denied**.

## II. FINDINGS OF FACT

Three witnesses testified during the evidentiary hearing on behalf of the United States: Covington Police Officer Anthony Jansen, Fort Thomas Police Officer Mike Rowland, and Campbell County Police Officer Matt Meyer. (Doc. # 42). The Defendant called no witnesses. Weighing the credibility of the witnesses, the Court makes the following factual findings:

1. Around September 10, 2018, a confidential informant approached Covington Police Officer Anthony Jansen to report that an individual by the name of Laura West was selling methamphetamine to buyers in Northern Kentucky. (Doc. # 43 at 7:3-10). Officer Jansen had received tips from this confidential informant in the past and the informant had an established history of reliability with law enforcement agencies in the area. *Id.* at 7:11-22. An initial investigation of Ms. West revealed that she had active arrest warrants for probation violations. *Id.* at 13:14-25.

2. On October 2, 2018, the confidential informant told Officer Jansen that he/she could arrange to purchase methamphetamine from West in Northern Kentucky. *Id.* at 8:2-5. With Officer Jansen's permission, the confidential informant conducted a series of police-monitored phone calls with West to arrange the methamphetamine sale. *Id.* at 8:7-14. During the calls, West agreed to deliver to the informant one pound of methamphetamine for either $5,500 or $5,600. *Id.* at 8:18-21. The transaction was to take place on October 3, 2018 in Verona, Kentucky. *Id.* at 9:15-20.

3. At around 8:00 p.m. on October 3rd, the confidential informant placed a controlled phone call to West, during which they agreed to meet in the parking lot of the Dollar General on Verona-Mudlick Road. *Id.* at 11:7-9. West indicated to the informant

that she was en route and would arrive at the Dollar General parking lot soon. *Id.* at 10:2-4.

4. During the phone calls with the confidential informant, West frequently used the first-person pronoun "we" and repeatedly implied that a male individual would be accompanying her to the drug deal. *Id.* at 10:6-13, 20:5-18. At one point, West said something to the effect of "my dude doesn't want there to be any funny business." *Id.* at 10:18-22. Officer Jansen stated that in his experience, he interpreted this and other similar statements to mean that West was bringing her source of supply to the transaction. *Id.* at 26:18-27:8.

5. At around 8:45 p.m., the confidential informant had another controlled call with West, who stated that she was thirteen minutes away. *Id.* at 11:15-21. To prepare for West's arrival, police set up multiple surveillance units within viewing distance of the Dollar General parking lot. *Id.* at 11:24-12:2, 30:2-4. The officers also placed the confidential informant's vehicle in the parking lot to give the appearance that the informant was in fact at the location.

6. Shortly before 9:00 p.m., the confidential informant received a phone call from West, who advised that she had arrived at the Dollar General parking lot. *Id.* at 12:6-10. In another call shortly thereafter, West told the informant that she was in a dark gray or black Nissan sedan that would be backing into a parking spot on the Dollar General lot. *Id.* at 12:20-13:2, 65:1-2. West also instructed the informant to enter her vehicle in order to retrieve the drugs. *Id.* at 12:20-24. Both of these calls were monitored by Officer Jansen, who relayed the relevant information to the waiting surveillance units. *Id.* at 13:9-13, 30:5-9.

7. Soon after receiving the radio transmission from Officer Jansen, Officer Michael Rowland, who was located approximately a half mile away from the Dollar General parking lot, observed a dark-colored sedan exit I-75, pull into the parking lot, and back into a space. *Id.* at 30:12-15. Rowland noticed that no one exited the vehicle after it was parked. *Id.* at 65:11-13. At this time, there were fewer than ten vehicles parked in the lot, and only one of them matched the physical description given by Ms. West and the confidential informant. *Id.* at 16:25-17:2, 66:6-9. In addition, the dark-colored sedan was the only car in the lot that was backed into a parking space. *Id.* at 67:13-15.

8. Shortly after Rowland saw the dark-colored sedan enter the parking lot, an agent radioed that West's vehicle had arrived. *Id.* at 30:16-17. It was at this point that the officers approached the vehicle with their lights flashing. *Id.* at 30:17-18, 65:15-17. Upon arriving, the police officers observed three occupants of the vehicle, a male, who was the driver, and two female passengers—one in the front passenger seat and another in the right rear passenger seat. *Id.* at 24:8-10, 26:9-13, 30:23-25, 43:4-5, 65:18-20. The officers ordered all three occupants out of the vehicle. *Id.* at 31:4, 42:25-43:3. The driver, later confirmed to be Quinn Turner, and the front seat passenger, later identified as Shara Brown, were both immediately handcuffed and detained. *Id.* at 65:18-19, 72:2-17. Sergeant Weber then searched Turner and seized a set of car keys from his pocket. *Id.* at 66:17-18, 73:3-12. The woman in the back seat was identified as Laura West and was thereafter immediately arrested and handcuffed. *Id.* at 71:14-19, 72:8-10.

9. After Turner, West, and Brown were handcuffed, Officer Rowland deployed a K-9 named Rexo that alerted to the presence of narcotics while sniffing the exterior driver's side of the car. *Id.* at 31:12-17. Officer Rowland then opened the car door to

4

allow Rexo to sniff the inside of the vehicle. *Id.* at 31:22-24. While in the vehicle, Rexo alerted to the presence of narcotics in the area around the front passenger seat. *Id.* at 31:24-32:3. Officer Meyer then used one of the keys that was seized from Turner's pocket to open the locked glove compartment. The key to the glove compartment was contained within the car's key fob, which also contained the ignition key. *Id.* at 74:4-16. Inside the glove compartment, Officer Meyer found a large quantity of methamphetamine as well as a firearm. *Id.* at 66:16-67:2.

## III. ANALYSIS

Defendant Turner seeks to suppress the methamphetamine recovered from the glove compartment of the vehicle he was driving. In doing so, Turner argues that his arrest was not supported by probable cause and therefore, the seizure of the key from his pocket that was used to open the glove compartment was unconstitutional. Defendant further contends that the police lacked probable cause to search the vehicle because the canine that alerted to the presence of narcotics was unreliable. For the reasons articulated below, Defendant's motion will be **denied**, because his arrest was supported by probable cause and the search of his person was a lawful search incident to arrest. Further, the seizure of the key from Turner's pocket was permissible, as there was reason to believe that it would lead to the discovery of inculpatory evidence. Finally, the officers' substantial corroboration of the confidential informant's tip created probable cause to search Defendant's vehicle.

### A. There was probable cause to arrest Turner.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall

not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. Warrantless arrests are permissible "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *accord Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).

There is no "precise formula" for assessing probable cause. *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998). Rather, "[t]o determine whether an officer had probable cause to arrest an individual, [courts] examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). "While probable cause means that 'officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt.'" *United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006) (quoting *Strickland*, 144 F.3d at 416).

In the case at bar, Turner concedes that police had probable cause to arrest and search his co-defendant, Ms. West,[1] but asserts that there was no probable cause as to

---

[1] Indeed, at the time of West's arrest, "officers knew of several significant incriminating circumstances suggesting that [West] was involved in narcotics trafficking." *Romero*, 452 F.3d at 616. Officers heard someone who they suspected was Laura West tell the confidential informant by phone that she would sell him one pound of methamphetamine. (Doc. # 43 at 8:18-21). Police were then able to independently observe many of the details of the proposed drug transaction, including the time and location of West's arrival, the physical description of West's car, and the manner in which her car would be parked. *Id.* at 30:12-15. Thus, in addition to the outstanding arrest warrants, police had probable cause to arrest West on suspicion that she was committing the crime of methamphetamine trafficking. *See Strickland*, 144 F.3d at 412 ("[T]he corroboration of a certain amount of information provided by an informant can be sufficient to establish probable cause to arrest and search a criminal suspect."); *United States v. Gill*, 685 F.3d 606, 610 (6th Cir. 2012).

himself because "at the time of his arrest and search, the officers had no evidence to connect Mr. Turner to any illegal activities involving Ms. West." (Doc. # 44 at 7). Turner's argument is contradicted by the record and foreclosed by existing precedent. It is true that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). In *Ybarra*, the Court held that a warrant authorizing the search of a bartender did not also permit police to search the bar's patrons. *Id.* at 91-92. However, the Supreme Court later declined to extend *Ybarra* to a search of a car passenger during a traffic stop. *See Pringle*, 540 U.S. at 372-73. In *Pringle*, the Supreme Court explained that "a car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id.* at 373. Thus, "it was reasonable for the officer to infer a common enterprise among the three men [in the car]." *Id.* at 373.

The Sixth Circuit in *United States v. Romero* applied *Pringle*'s reasoning to justify the arrest of a man found in the same hotel room as someone who had arranged a drug transaction with an undercover police officer. 452 F.3d at 618. Romero—the target of the investigation—invited an undercover officer to come to his hotel room to purchase methamphetamine. *Id.* at 614. When the officer entered the hotel room, he arrested both Romero and a second individual, who was later identified as Israel Santiago. *Id.* In their background investigation, Police had learned that Romero's room was reserved under the name Israel Santiago but were unsure at the time whether Santiago was a separate person or an alias used by Romero. *Id.* The Sixth Circuit found that "while the officers

7

had not confirmed Santiago's identity when they arrested him, the fact that he was the only other person present in the hotel room and the fact that Romero had already identified himself to the officer would warrant a prudent person in those circumstances to conclude that the man sitting on the bed was indeed Santiago." *Id.* at 617. Furthermore, Santiago's presence in the "relatively small and confined space of the hotel room" at the time the drug deal was to occur was itself sufficient to constitute individualized suspicion that he was involved in Romero's drug-dealing enterprise. *Id.* at 618 & n.2. This was because "drug dealing is 'an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.'" *Id.* at 618 (quoting *Pringle*, 540 U.S. at 373).

The instant case is analogous in many respects to *Romero*. Here, as in *Romero*, the Defendant was discovered in a confined area with another individual who police suspected was in the process of selling a large quantity of methamphetamine. Also like in *Romero*, law enforcement officers in this case had not confirmed the identity of the Defendant, but were able to deduce who he was through process of elimination. Specifically, Officer Anthony Jansen testified that during police-monitored phone calls arranging the drug deal, Ms. West made numerous references to a male who would be accompanying her to the drug transaction and made statements that, in Officer Jansen's experience, suggested that this individual was her supplier.[2] (Doc. # 43 at 10:6-11:2,

---

[2] Turner attempts to obfuscate this fact by citing the following passage from cross-examination of Officer Jansen: "Q. Okay. Did the confidential informant have any idea where Ms. West was getting her drugs? A. To my knowledge, no." *See* (Doc. # 44 at 3) (citing (Doc. # 43 at 22:10-11)). However, that the informant did not know the precise identity of Ms. West's source of supply does not contradict the fact that Ms. West implied in her conversations with the informant that her source of supply would be accompanying her to the drug deal. Furthermore, in making probable-cause determinations, police officers are permitted to draw inferences based on their law enforcement experience and "may make 'deductions that might well elude the

20:5-18, 26:18-27:14). As Defendant Turner was the only male occupant of the car, a reasonable officer in those circumstances could conclude that he was the individual Ms. West alluded to in her telephone conversations with the informant. If anything, this case presents stronger evidence of probable cause than that presented in *Romero*, because here the police had prior evidence that the Defendant was in fact involved in the drug transaction.

In summary, because there was probable cause to arrest Ms. West for drug trafficking, Mr. Turner's presence in the car with Ms. West at the time and location of the arranged drug deal created probable cause to arrest him as well. Moreover, West's remarks in her conversation with the confidential informant suggesting that Turner was her supplier provided additional evidence that Turner was involved in drug trafficking. Thus, the Court concludes that law enforcement officers had probable cause to arrest Mr. Turner.

### B. The seizure of Turner's keys was reasonable.

Defendant also argues that the seizure of the fob which contained the key used to open the glove compartment was unreasonable and that the methamphetamine found in the glove compartment must be suppressed as the fruit of that unreasonable seizure. (Doc. # 44 at 7-8). Defendant's argument fails. Having found that Defendant's arrest was supported by probable cause, it necessarily follows that the officers had authority to conduct a search of Turner's person, incident to that lawful arrest. *United States v.*

---

untrained person.'" *United States v. Arnold*, 442 F. App'x 207, 211 (6th Cir. 2011) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Given his experience as a law enforcement officer who specializes in narcotics interdiction, *see* (Doc. # 43 at 6:10-17), it was appropriate for Officer Jansen to conclude that West was referring to her source of supply in telephone conversations with the informant.

9

*Campbell*, 486 F.3d 949, 955 (6th Cir. 2007) (citing *United States v. Robinson*, 414 U.S. 218, 235 (1973)). Furthermore, officers "may seize both contraband and any instrumentalities, fruits, or evidence of a crime that they discover in the course of the search." *United States v. Stewart*, 315 F. App'x 554, 559 (6th Cir. 2009).

Items such as keys, which are not themselves contraband or fruits of a crime, may be seized only where the government can demonstrate a "nexus" between the items and the criminal activity. *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967); *see United States v. Shelton*, 742 F. Supp. 1491, 1495-96 (D. Wyo. 1990) (collecting cases in which courts allowed seizure of keys incident to a lawful arrest). In other words, there must be "cause to believe that the evidence sought will aid in a particular apprehension or conviction." *Hayden*, 387 U.S. at 307. In *Stewart*, the Sixth Circuit found that police had probable cause to seize a set of car keys from the defendant's person when there was reason to believe that the vehicle associated with the keys contained "fruits, evidence or instrumentalities of [defendant's] drug-related offense." *Stewart*, 315 F. App'x at 560. The same is true in this case. As will be discussed *infra*, officers had probable cause to believe that there was evidence of methamphetamine trafficking in the car Turner was driving. Thus, there was a nexus between the car's key fob and the suspected criminal activity. Accordingly, the seizure of the key fob from Turner's pocket did not run afoul of the Fourth Amendment.

**C.    The search of the vehicle was supported by probable cause.**

Finally, the search of Defendant's vehicle, including the glove compartment where the methamphetamine was found, was permissible under the Fourth Amendment. Police officers may conduct a warrantless search of a vehicle "if they have 'probable cause to

believe that the vehicle contains evidence of a crime.'" *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)).  "The court's determination of whether probable cause existed at the time of the search is a 'commonsense, practical question' to be judged from the 'totality-of-the-circumstances.'"  *Id.* (quoting *Smith v. Thornburg*, 136 F.3d 1070, 1074-75 (6th Cir. 1998)).  Probable cause to search a vehicle "may come from a confidential informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers." *Lumpkin*, 159 F.3d at 986.

At the time officers searched Turner's vehicle, they had probable cause to believe the car contained evidence of the crime of methamphetamine distribution and were therefore justified in their warrantless search.  To reiterate, the police officers had listened in on phone conversations between West and a reliable informant, during which West promised to sell one pound of methamphetamine at a specific time and location.  (Doc. # 43 at 8:18-21).  West also described the car she would be traveling in and the manner in which it would be parked.  *Id.* at 12:20-13:2, 65:1-2.  The arresting officers then corroborated the details of the drug transaction, including the physical description of West's car, the time and location at which it arrived, and the manner in which it was parked.  *Id.* at 30:12-15.  Put simply, the officers' first-hand observation of phone calls arranging a controlled buy, the verification of the details discussed during those calls, and West's act of transporting drugs to the proposed drug deal created probable cause to search the vehicle West was traveling in. *See United States v. Lewis*, 615 F. App'x 332, 338 (6th Cir. 2015); *United States v. Arnold*, 442 F. App'x 207, 211 (6th Cir. 2011); *United States v. Jouett*, 87 F. App'x 539, 541-42 (6th Cir. 2004).

Once the police have probable cause to search a vehicle for contraband, the police also have probable cause to search "every part of the vehicle and all containers found therein in which the object of the search could be hidden." *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012) (citing *United States v. Crotinger*, 928 F.2d 203, 205 (6th Cir. 1991)). Accordingly, as police had probable cause to search Turner's vehicle, they also had probable cause to search the vehicle's glove compartment.

Turner argues at length that the police dog's positive alert did not establish probable cause to search the vehicle because the dog was "not independently tested or certified" and "had no history demonstrating reliability." (Doc. # 44 at 9). The Court declines to weigh in on the reliability of the police dog. As discussed, officers had probable cause to search the vehicle prior to the deployment of the police dog. Moreover, as set forth below, the search of the vehicle was also justified as a search incident to arrest, the legality of which did not hinge on the reliability of the dog sniff.

**D.     The search of the vehicle was also permissible as a search incident to a lawful arrest.**

The Supreme Court decision in *Arizona v. Gant* provides a second basis for the search of Turner's vehicle. In that case, the Court held that police may search a vehicle incident to a lawful arrest "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343 (2009) (internal quotation marks omitted). As is relevant in this case, the search of the car "may extend to containers that could contain relevant evidence, such as a locked glovebox." *United States v. Alexander*, 467 F. App'x 355, 363 (6th Cir. 2012) (citing *United States v. Nichols*, 512 F.3d 789, 797 (6th Cir. 2008)). As previously discussed, probable cause justified Turner's arrest because there was reason to believe that he was involved in the

drug transaction that Ms. West had arranged with the confidential informant. *See supra* Part III.A. In addition, police had an even stronger basis to arrest Ms. West, who was the original target of the drug-trafficking investigation. Accordingly, as both Turner and West were lawfully arrested[3] for suspected drug-trafficking, the contemporaneous search of the vehicle's glove compartment was justified as a search incident to either of those arrests.

In the post-hearing Memorandum in support of his Motion, Turner asserts that the search of the glove compartment was unlawful because, pursuant to *Gant*, police are only permitted to search "the area of the vehicle which was in the arrestee's immediate control." (Doc. # 44 at 8). Turner misreads *Gant*, which imposes this limitation only when the arrestee is "unsecured and within reaching distance of the passenger compartment at the time of the search." *Gant*, 556 U.S. at 343. Where, as here, it is reasonable to believe the vehicle contains evidence of the offense of arrest, the police may search "the passenger compartment of an arrestee's vehicle and any containers therein," regardless of whether the arrestee is secured. *Id.* at 344; *see United States v. Latham*, 763 F. App'x 428, 430-31 (6th Cir. 2019) (applying *Gant* to find that officers properly searched defendant's vehicle incident to his arrest despite the fact that he was secured in the back of a patrol car because it was reasonable to believe the vehicle contained evidence relevant to the crime of arrest).

---

[3] The fact that Turner was only "detained" and not formally arrested at the time of the vehicle search, (Doc. # 43 at 71:18-22), is of no consequence, as "the formal arrest follow[ed] 'quickly on the heels of the challenged search' and 'the fruits of that search [were] not necessary to sustain probable cause to arrest.'" *United States v. McCraney*, 674 F.3d 614, 619 (6th Cir. 2012) (quoting *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004)).

## IV. CONCLUSION

Accordingly, for the reasons set forth herein,

**IT IS ORDERED** as follows:

(1) Defendant's Motion to Suppress (Doc. # 29) is **denied**;

(2) The time period between February 18, 2019 and the date of the entry of this Order, totaling one hundred thirty-four (134) days, is **excluded** from the provisions of the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(1)(D) & (H); and

(3) This matter is scheduled for a **Status Conference** on **Monday, July 8, 2019 at 10:30 a.m. in Covington** at which time the Court will set this matter for trial.

This 2nd day of July, 2019.



Signed By:
David L. Bunning
United States District Judge

J:\DATA\ORDERS\Covington Criminal\2018\18-53 MOO Denying MTS.docx