UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CRIMINAL ACTION NO. 18-53-DLB-CJS-1

UNITED STATES OF AMERICA                                                                          PLAINTIFF

v.                                      **MEMORANDUM ORDER**

QUINN TURNER                                                                                            DEFENDANT

\*\*  \*\*  \*\*  \*\*  \*\*  \*\*  \*\*  \*\*

## I.     INTRODUCTION

This matter is before the Court upon Defendant Quinn Turner's motion to suppress evidence seized from 3605 Craig Avenue in Louisville, Kentucky on June 10, 2018. (Doc. # 107). After several continuances due to the Covid-19 pandemic (Docs. # 110, 122 & 135), the motion was finally scheduled for an evidentiary hearing on June 4, 2020 (Doc. # 153). The United States was present through counsel, Assistant U.S. Attorney Tony Bracke. Defendant Turner was present and represented by co-counsel Michael Goodwin and Rob Eggert. Official Court Reporter Lisa Wiesman transcribed the proceedings. Upon the filing of Defendant's Reply Brief (Doc. # 155), the motion was finally ripe for the Court's review. For the reasons set forth herein, Defendant's Motion to Suppress (Doc. # 107) is **granted**.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

At approximately 4:30 a.m. on June 10, 2018, Louisville Metro Police ("LMP") Officer Jay Dolak received a call from dispatch of an anonymous tip that there was a meth

1

lab at 3605 Craig Avenue in Louisville.  The officers had no additional information about the tip or the tipster.  Dolak was familiar with Craig Avenue as it was part of his patrol area and was known to be a rough neighborhood with a history of drugs and violence.  Upon receiving the anonymous tip, Dolak, accompanied by fellow LMP Officer Tyler Blissett and an unnamed ride-along, responded to the house.  Both Dolak and Blissett had been with the LMPD for less than two years at the time.

Upon arriving at the house, the officers did a visual scan around the perimeter of the house.  Other than observing that the windows appeared to be lined with cellophane and the presence of hay bales along the side of the house which appeared to be out of the ordinary, the officers saw nothing to corroborate the anonymous tip of the presence of a meth lab.

At approximately 4:37 a.m., Officer Blissett approached the front door of the house.  His body camera (Doc. # 154 at Government Exhibit 1) shows it was still dark when he approached the door.  Blissett then knocked on the front door to conduct what he described as a "knock and talk."  Blissett did not identify himself as the police as he was knocking on the door.  After Blissett knocked several times, Officer Dolak noticed that the light in the back bedroom was turned off, a fact that he shared with Officer Blissett.  Dolak testified that the bedroom light being extinguished caused them to have a heightened sense of alertness.  Growing impatient with no one answering the door, Officer Blissett then shouted that they needed to open the door or it would be kicked in and a dog would be sent in.

Once Blissett threatened to kick the door in and send in the dog, a female companion of the Defendant, Ms. Raneiea Miller, opened the door a few seconds later.

2

The Defendant was standing behind her as she opened the door. Although the anonymous tip allegedly involved a suspected meth lab, Blissett told Ms. Miller that the officers were called to that location because of a missing child. Blissett said an eight-year-old white boy named Andrew had been abducted and was suspected to be at the house. Both Ms. Miller and the Defendant are black. Ms. Miller was then asked if she minded if the officers did a quick sweep of the house to see if Andrew was there.

The officers' story about the missing white boy was a complete ruse to obtain Ms. Miller's consent. The officers' ruse worked as designed, as Ms. Miller consented to allow the officers to enter the residence to look for the allegedly abducted child.

While inside the residence looking for the missing child that they knew did not exist, officers located small bags of marijuana. After discovering the marijuana, Ms. Miller gave consent to allow an additional search. During that further search, two firearms were found under a mattress in close proximity to the marijuana. The officers also found large sums of currency inside oven mitts in the kitchen. During the search, Ms. Miller asked for permission to use the restroom. Pursuant to the police department's policy, an officer accompanied her into the restroom to check the commode to ensure she would not dispose of evidence. While checking the commode, officers discovered six bags of meth and a bag of heroin inside the commode.

A state search warrant was eventually obtained. Officer Blissett was the affiant. The affidavit included the information obtained during the officers' purported search for the missing eight-year-old boy and the subsequent search based on Ms. Miller's purported consent after the marijuana was observed in plain view. That evidence

3

included the marijuana, drug paraphernalia, two firearms, currency, and suspected narcotics. (Doc. # 154 at Government Exhibit 3).

### III. ANALYSIS

**Based on the circumstances of the officers' ruse to obtain entry into the residence, Ms. Miller's consent was invalid.**

It is well settled that "the Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990); *see Kyllo v. United States,* 533 U.S. 27, 31 (2001) ("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.") (internal quotations omitted); *United States v. Thomas,* 430 F.3d 274, 276 (6th Cir. 2006) ("The Fourth Amendment has drawn a firm line at the entrance to the house." (quoting *Payton v. New York,* 445 U.S. 573, 590 (1980))). "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo,* 533 U.S. at 31.

However, it is equally well settled "that a person may waive his Fourth Amendment rights by consenting to a search." *United States v. Carter,* 378 F.3d 584, 587 (6th Cir. 2004). To be valid, consent must be given freely and voluntarily. *Id*. Voluntary consent must be "unequivocal and intelligently given, untainted by duress or coercion." *United States v. Cooke,* 915 F.2d 250, 252 (6th Cir. 1990).

Here, the issue is whether the officers' story about searching for the missing young white boy to obtain entry into the residence invalidated Ms. Miller's purported consent. For the reasons that follow, the Court concludes that it did, and therefore, the evidence which was seized subsequent to the invalid consent must be suppressed.

4

The Court recognizes that a "a ruse or officers' undercover activity does not usually violate individuals' rights." *United States v. Hardin*, 539 F.3d 404, 424 (6th Cir. 2008). For instance, as the United States points out, an officer's misrepresentation of his identity does not negate consent. (Doc. # 109 at 5); *United States v. Lord*, 230 F. App'x 511, 513–14 (6th Cir. 2007) (citing *United States v. Pollard,* 215 F.3d 643, 648 (6th Cir.2000)). However, "[i]n some instances, a ruse or trick by the police can undermine an otherwise consensual encounter." *United States v. Gregory*, 456 F. App'x 533, 536 (6th Cir. 2012) (citing *Hardin*, 539 F.3d at 424–27). More specifically, when a police officer's "misrepresentation of purpose [was] so extreme that it deprive[d] the individual of the ability to make a fair assessment of the need to surrender his privacy," consent is invalidated. *Id.* at 536 (alterations in original) (quoting *Hardin*, 539 F.3d at 425). In answering this question, courts must ask "whether the ruse created a scenario where [the individual] 'ha[d] no choice' but to concede his privacy interests." *Id*. (alterations in original) (citing *Hardin*, 539 F.3d at 425).

Of course, this determination is highly fact dependent. For instance, in *Hardin*, following the issuance of an arrest warrant, the police received a tip that the defendant was staying at his girlfriend's apartment. *Hardin*, 539 F.3d at 407. The police then instructed the apartment manager to search the apartment for the defendant under the guise of checking for a water leak. *Id*. The urgency of a water leak, as conveyed through an apartment manager, compelled the defendant to allow entry, and thus, invalidated consent. *Id*. at 425.

In comparison, in *Gregory*, a detective requested that a defendant accompany him to the defendant's home so as to assist in an arson investigation. *Gregory*, 456 F.App'x

5

at 534.  Although the arson investigation was revealed to be a ruse used to deliver defendant to officers for questioning in a drug investigation, the defendant's consent to search was not invalidated.  *Id*. at 536.  There, the facts were distinguishable from those in *Hardin* both because the defendant in *Gregory* knew he was speaking with a law enforcement officer, and, unlike the water leak ruse, the arson investigation ruse did not present the same "sense of urgency and compulsion for the defendant."  *Id*.

In light of limited Sixth Circuit case law distinguishing which ruses negate consent, the court in *Hardin* noted that numerous federal and state court decisions "illustrate the decidedly *non-novel* proposition that officers may invalidate an individual's consent through the use of certain ruses or trickery."  *Hardin*, 539 F.3d at 425 n.12 (collecting cases).  For example, consent was invalidated when officers "invented a story" that a young girl had just reported that a defendant's roommate had raped her, and the officer requested to look around to see if the residence matched the girl's description, as the court there found that such a ruse "crossed the line of civilized notions of justice."  *Id*. (quoting *Krause v. Commonwealth,* 206 S.W.3d 922, 924–28 (Ky. 2006)).  Similarly, a ruse which involved a DEA agent stating he was searching for a missing child and holding up a flier of the alleged child was found to invalidate consent.  *See United States v. Duane*, No. 3:06-CR-13-S, 2010 WL 11678972, at *5 (W.D. Ky. Mar. 1, 2010) (citing *United States v. Montes-Reyes*, 547 F.Supp.2d 281 (S.D.N.Y. 2008)), *report and recommendation adopted*, 2010 WL 11678973 (W.D. Ky. Apr. 1, 2010); *see also United States v. Rose*, 1:14-CR-3-JHM, 2014 WL 4109619, at *4 (W.D. Ky. Aug. 20, 2014) (finding ruse related to search for a person with outstanding arrest warrant for failure to pay child support did

6

not invalidate consent, because unlike a missing child ruse, the tactic did not create a sense of urgency or compulsion).

Here, the missing child ruse employed by the officers raises the exact same concerns as to whether a "sense of urgency and compulsion" was created for Ms. Miller, such that she felt compelled to allow the police to enter her residence to search for the purportedly missing young boy. *See Gregory*, 456 F.App'x at 536. While not controlling case law, *Montes-Reyes* offers sound reasoning as to why a missing child ruse would make an individual feel compelled to surrender his privacy rights and give consent. *Montes-Reyes*, 547 F.Supp.2d at 291. There, the court reasoned that the problem of missing children is universally recognized as a "profoundly serious" issue, such that private citizens are called upon to assist in search efforts through AMBER alerts and other means. *Id*. The fact that a defendant knows a missing child is not in his residence does not diminish the feeling of being compelled. *Id*. In fact, whereas showing an officer that a missing child is not in the residence allows the officer to continue searching elsewhere in the community, refusing a search during such a "grave emergency" would result in delay of the search for the child and the possibility of several officers being dispatched to investigate the matter. *Id*.

Other cases from outside the Sixth Circuit are also persuasive on this point. *See, e.g.*, *Pagán-González v. Moreno*, 919 F.3d 582, 595-96 (1st Cir. 2019) ("[C]ourts have uniformly recognized that the Fourth Amendment may be violated when consent is obtained through a law enforcement officer's . . . lies conveying an exigent need for the search."); *United States v. Vazquez-Velazquez*, 1:11-CR-212-TCB-GGB, 2012 WL 917845, *6 (N.D. Ga. Feb. 23, 2012) ("Under such circumstances, courts have found that

7

consent is not voluntary because the consentor was led to believe that there was a life-threatening emergency and that his [cooperation] was required to prevent such a calamity."), *report and recommendation adopted*, 2012 WL 912787 (N.D. Ga. Mar. 16, 2012).

Here, Ms. Miller's consent to allow the officers into her home to search for a missing eight-year-old boy that they knew did not exist was invalid. Although not all ruses used by the police will invalidate an otherwise valid consent, the ruse utilized by the officers here did just that. Ms. Miller's consent was invalid. Because Ms. Miller's initial consent allowing the officers to enter her residence was not valid, the fruits of the subsequent search of the residence must be suppressed.

One final matter deserves brief comment. Defendant also argues that Ms. Miller's subsequent consent to further search after the marijuana was found in plain view was invalid because the officers threatened to call Child Protective Services and take her kids if she refused to sign the written consent to search. The Court need not address this argument because the initial entry and consent given by her to allow the officers to enter the house was invalid. *See United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008) (explaining that the "fruit of the poisonous tree" doctrine "bars the admissibility of evidence which police derivatively obtain from an unconstitutional search"). As a result, all evidence discovered and seized by the officers which flowed from that unconstitutional entry is subject to suppression.

8

## IV.  CONCLUSION

Accordingly, **IT IS ORDERED** that:

(1) Defendant Turner's Motion to Suppress Fruits of Search of Louisville Residence (Doc. # 107) is **GRANTED**;

(2) The time period from February 19, 2020 through today's date, totaling one hundred forty-one (141) days, is **excluded** from the provisions of the Speedy Trial Act, pursuant to 18 U.S.C. §§ 3161(h)(1)(D)&(H); and

(3) This matter is scheduled for a **Status Conference** on **Thursday, July 16, 2020 at 11:00 a.m. in Covington**.

This 9th day of July, 2020.

Signed By:
*David L. Bunning*
United States District Judge